[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16296
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-00291-SCJ-JSA-8

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSHUA GADD,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 13, 2017)

Before HULL, JORDAN and ROSENBAUM, Circuit Judges.

PER CURIAM:

After pleading guilty, Joshua Gadd appeals his 66-month sentence for one count of conspiracy to distribute and dispense Oyxcodone, Oxycodone and Acetaminophen, and Morphine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and (b)2. On appeal, Gadd argues that the district court erred in applying a three-level increase to Gadd's offense level for his role as a manager or supervisor, pursuant to U.S.S.G. § 3B1.1. Gadd also argues that the district court should have applied a two-level "safety valve" reduction pursuant to U.S.S.G. § 2D1.1(b)(17) and that his 66-month sentence, which is at the low end of his advisory guidelines range of 63 to 78 months, was substantively unreasonable.  Upon thorough review of the record and the parties' briefs, we affirm Gadd's sentence.

## I.  FACTUAL BACKGROUND

### A.    Offense Conduct

In December 2012, the Drug Enforcement Administration ("DEA") received information that Dr. David Battista was running a suspected "pill mill" in Atlanta, Georgia and was distributing prescription drugs for no legitimate medical purpose. Following a subsequent DEA investigation into Dr. Battista's clinical practice, the DEA discovered a new "pill mill" had opened at 3149 East Shadowlawn Avenue in Atlanta, managed by Anthony Licata.

The DEA investigated the clinic at 3149 East Shadowlawn Avenue, conducting visual surveillance and using undercover officers. Through their

2

investigation, the DEA learned that Licata, along with clinic manager Charlyn Carter, Dr. Romie Roland, and security guard Adrian Singletary offered controlled substances to customers without a legitimate medical reason in exchange for significant proceeds from the customers.

The DEA obtained court-authorized wiretaps of Licata's phone and began intercepting Licata's phone calls. Through the interceptions, the DEA learned of at least four calls between defendant Gadd and Licata, placed from December 16, 2013 to January 24, 2014. In these calls, Gadd would tell Licata that he was on the way to the clinic with recruited patients. Licata would respond by offering Gadd commissions as compensation for his "recruitment" of patients.

Additional DEA investigation revealed that Gadd, along with three other codefendants, worked as sponsors for Licata's "pill mill" drug distribution scheme. Gadd and the three codefendants would arrange for patients to visit the clinic and would occasionally pay for the patients' visits. Gadd and the three codefendants received kickback or commission payments from Licata of $50 to $100 for each new patient they had brought in. Surveillance of Gadd showed that he brought in at least ten recruits to the clinic. On at least one occasion, Gadd offered Licata $100 worth of cocaine as partial payment for the clinic visits of his recruits.

3

**B.**    **Gadd's Arrest**

On August 6, 2014, a federal grand jury returned an indictment as to various members of the Licata "pill mill" operation, including Gadd. The indictment charged Gadd with one count of conspiracy to distribute and dispense Oyxcodone, Oxycodone and Acetaminophen, and Morphine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and (b)(2). In conjunction with the indictment, an arrest warrant for Gadd was issued. A search warrant did not accompany the arrest warrant.

At 6:00 a.m. on August 7, 2014, police officers arrested Gadd at his residence in Atlanta. The arresting officers knocked on the door of Gadd's residence and announced their presence, but Gadd did not immediately respond. After waiting a short period,[1] the arresting officers announced a second time and again heard no response. The arresting officers then entered Gadd's residence and arrested him. After Gadd was arrested and placed in handcuffs, several officers performed a security sweep of the room and discovered four cell phones, which they seized.[2] Following seizure of the cell phones, the government examined the phones' contents and found a recorded conversation between Gadd and Meghan

---

[1]The officers' testimony characterized the wait time between the first knock and announce and the officers' entry as being anywhere from 10 seconds to 45 seconds.

[2]Arresting-officer testimony characterized the cell phones as being on the bed "in plain view" at the time of the security sweep. Gadd testified that the cell phones were hidden from view under pillows at that time.

Cavanaugh, a prospective patient for the Licata "pill mill" who ultimately declined to join.

## C.    Procedural History

On October 29, 2014, Gadd filed a motion to suppress the evidence recovered from the four seized cell phones, arguing that any cell phone evidence was the product of an illegal search. The magistrate judge held an evidentiary hearing on the motion and recommended that Gadd's motion to suppress be denied. However, on May 20, 2016, before the district court ruled on Gadd's motion to suppress, Gadd entered a guilty plea to the charged offense.

## D.    Presentence Report

Following Gadd's guilty plea, the probation officer prepared a presentence investigation report ("PSR"). The PSR determined Gadd to be responsible for 767.418 kilograms of marijuana equivalent through his participation in the Licata drug conspiracy. The PSR calculated a base offense level of 28 because the offense involved between 700 and 1,000 kilograms of marijuana equivalent, pursuant to U.S.S.G. § 2D1.1(c)(6).

The PSR also calculated a three-level increase for Gadd's role as a manager or supervisor in the conspiracy pursuant to § 3B1.1(b). The PSR stated that, though Gadd was not the owner of the clinic, he was part of a group of "sponsors" who "financed and profited from sending recruited patients through the clinic." The

PSR stated that the sponsors, including Gadd, gave patients transportation, paid for their lodging and clinic appointments, and filled their prescriptions. In return, the sponsors received kickbacks or commissions from Licata for each new patient introduced to the clinic. Additionally, the patients themselves sometimes offered the sponsors pills from their filled prescriptions as a reward for facilitating the drug transaction.

The PSR determined that Gadd was entitled to a two-level reduction pursuant to § 3E1.1(a) for acceptance of responsibility, bringing his total offense level to 29. With a criminal history category of I, Gadd's advisory guidelines range was 87 to 108 months' imprisonment.[3] See U.S.S.G. § 5 Pt. A.

## E.    Gadd's Sentencing Memorandum

On September 9, 2016, Gadd filed a sentencing memorandum, objecting to certain facts recounted in the PSR. Gadd first argued that the government failed to sufficiently show that Gadd was responsible for more than 700 kilograms of marijuana equivalent. Gadd argued that the government's proposed quantity was based in part on unreliable hearsay.

---

[3]The page that summarizes the court's sentencing options in the PSR states that Gadd's calculated total offense level was 31 and gives the corresponding higher advisory guidelines range. However, based on the detailed calculations earlier in the PSI, Gadd's adjusted total offense level was 29, resulting in the advisory guidelines range of 87 to 108 months' imprisonment.

Gadd also argued that the three-level role increase under § 3B1.1(b) was improper because he did not control, direct, or manage the "pill mill" operation. Gadd asserted that, unlike the other sponsors, he was "a broke drug addict" who was working for a small commission. Gadd contended that he did not provide people transportation to the clinic, put people up in hotels, pay for prescriptions to be filled, or routinely finance office visits.

Gadd argued that he should additionally receive a two-level "safety valve" reduction pursuant to §2D1.1(b)(17) because he was a minor player compared to the other indicted defendants. Gadd contended that his lack of criminal history and his offering of a truthful statement to the government supported the application of this reduction.

## F.     Sentencing Hearing

On September 13, 2016, the district court held a sentencing hearing. At the beginning of the hearing, the district court adopted the facts in the PSR, to which Gadd had not objected. The district court then addressed the three objections outlined in Gadd's sentencing memorandum: (1) Gadd's base offense level; (2) his three-level increase as a manager; and (3) the "safety valve" two-level reduction.

As to Gadd's base offense level, the district court held a colloquy with defense and government counsel, as well as the probation officer, concerning the quantity of drugs attributable to Gadd's involvement in the conspiracy. The district

7

court heard argument from defense counsel as to why certain drug labels overstated the amount of active ingredients attributable to Gadd, along with arguments that certain drug purchases could not be linked to Gadd and that Gadd consumed some of the drugs in question for legitimate pain-related needs. Following this discussion, the district court determined Gadd to be responsible for approximately 640 kilograms of marijuana equivalent and lowered Gadd's base offense level from 28 to 26.

As to the three-level managerial or supervisory increase, the district court reviewed Gadd's role in bringing patients to the clinic, heard argument from both parties on the issue, and ultimately denied Gadd's objection. The district court found that "Mr. Gadd's recruitment and . . . the nature of participation in the commission of the offense would make this a proper role enhancement."

The district court also denied Gadd's request for the two-level "safety valve" reduction as "moot" because a "safety valve" reduction cannot be applied to someone who plays a managerial or supervisory role in a conspiracy as a matter of law. However, the district court granted Gadd a two-level reduction for acceptance of responsibility.

Having considered Gadd's guidelines arguments, the district court calculated a total offense level of 27 and a criminal history category of I, resulting in a revised advisory guidelines range of 70 to 87 months' imprisonment.

8

The district court then heard argument concerning the 18 U.S.C. § 3553(a) factors. Gadd's counsel requested a downward variance to 24 months' imprisonment based on Gadd's abusive childhood, the death of several of Gadd's close family members including his wife, and Gadd's drug addiction following a back injury. Gadd's counsel described Gadd's post-arrest rehabilitative work, including his participation in group therapy sessions and his learning a trade. Gadd's counsel also argued that a codefendant in the same drug conspiracy had received a sentence of only 56 months' imprisonment despite having an advisory guidelines range of 97 to 121 months' imprisonment.

The government, for its part, also requested a downward variance, but it asked that Gadd's sentence be reduced to only 66 months' imprisonment due to Gadd's early involvement in the conspiracy and active recruitment of patients to the clinics. The government also argued that the 56-month sentence of Gadd's codefendant was not relevant because that codefendant pled guilty earlier in his respective case.

Following the parties' arguments and a review of the § 3553(a) factors, the district court granted in part Gadd's request for a variance and reduced Gadd's total offense level from 27 to 26, which, with Gadd's criminal history category of I, established a new advisory guidelines range of 63 to 78 months' imprisonment. The district court then sentenced Gadd to 66 months' imprisonment. The district

9

court acknowledged that Gadd may be addicted to drugs, but it explained that Gadd was "not . . . sitting here today . . . just because [he was] taking these pills." The district court stated that Gadd's sentence was based on the fact that he "recruit[ed] other people to come in and take these pills" and "ma[d]e them suffer just like [Gadd] ha[d] suffered." The district court noted that it also took "into consideration" the codefendant's 56-month sentence but did not find that this fact merited a revised sentence.

On September 23, 2016, Gadd timely appealed.

## II.  GUIDELINES CALCULATIONS

### A.    Managerial or Supervisory Increase

The district court did not clearly err in applying a three-level managerial increase to Gadd's offense level pursuant to § 3B1.1(b).[4]  The Guidelines call for the three-level increase if "the defendant was a manager or supervisor (but not an organizer or leader)" in a criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(b). According to the commentary, in determining the level of the defendant's participation in the criminal activity, the court should consider factors such as "the exercise of decision making authority,

---

[4]We review for clear error the district court's application of an aggravating role increase under U.S.S.G. § 3B1.1. See United States v. Zitron, 810 F.3d 1253, 1261 (11th Cir. 2016); United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005); United States v. Jiminez, 224 F.3d 1243, 1250-51 (11th Cir. 2000). Under clear error review, "[a]s long as the district court's findings are plausible, we may not reverse the district court even if we would have decided the case differently." United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003) (quoting United States v. Engelhard Corp., 126 F.3d 1302, 1305 (11th Cir. 1997)).

10

the nature of participation in the commission of the offense, the <u>recruitment of accomplices</u>, [and] the claimed right to a larger share of the fruits of the crime." <u>Id.</u> § 3B1.1 cmt. n.4 (emphasis added). This Court has held that a defendant acted in a managerial or supervisory role by recruiting others to join or otherwise participate in a conspiracy. <u>See</u> <u>United States v. Bergman</u>, 852 F.3d 1046, 1072 (11th Cir. 2017) (holding that a patient recruiter in a Medicare fraud case was a manager or supervisor); <u>see also</u> <u>United States v. Sosa</u>, 777 F.3d 1279, 1301 (11th Cir. 2015).

Gadd does not dispute that he was responsible for recruiting numerous patients to Licata's clinic to help them obtain narcotics prescriptions for no legitimate medical purpose. Although Gadd did not own or operate the clinic in question, "the defendant need only manage or supervise one other participant in the criminal activity" for the increase to apply. <u>Id.</u> It is well settled that recruitment of others into a criminal activity is managerial or supervisory activity for purposes of the increase. <u>See</u> <u>United States v. Mandhai</u>, 375 F.3d 1243, 1248 (11th Cir. 2004) ("[Defendant] recruited [co-conspirator] into the plot, prompted him to purchase weapons, and briefed him . . . . Nothing more was required."). Given Gadd's recruitment of numerous "patients" in exchange for kickbacks or commissions from Licata and occasional compensatory pills from the "patients" themselves, the district court did not clearly err in applying the three-level increase.

11

## B.    "Safety Valve" Reduction

The district court also did not err in denying Gadd's request for the two-level "safety valve" reduction.[5]  Section 2D1.1(b)(17) of the Guidelines provides that a defendant may receive the two-level reduction if he meets the "safety valve" criteria set forth in § 5C1.2(a). See U.S.S.G. § 2D1.1(b)(17). The defendant has the burden of proving that he meets all of the criteria. See United States v. Cruz, 106 F.3d 1553, 1557 (11th Cir. 1997). Among those criteria is the requirement that the defendant not be "an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines." U.S.S.G. § 5C1.2(a)(4).

On this record, the district court did not clearly err in denying Gadd the "safety valve" reduction. Because the district court did not clearly err in finding that Gadd played a managerial or supervisory role in the drug conspiracy, and because such a managerial or supervisory role precludes application of the "safety valve" reduction as a matter of course, Gadd fails to satisfy his burden entitling him to relief. See U.S.S.G. § 5C1.2(a)(4); Cruz, 106 F.3d at 1557.

## III.  SUBSTANTIVE REASONABLENESS

Gadd also has not shown that his sentence is substantively unreasonable. We review the reasonableness of a sentence for an abuse of discretion using a two-

---

[5]"When reviewing the denial of safety-valve relief, we review for clear error [the] district court's factual determinations." United States v. Johnson, 375 F.3d 1300, 1301 (11th Cir. 2004) (per curiam).

12

step process.  United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008).  We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively unreasonable in light of the § 3553(a) factors and the totality of the circumstances.  Id.[6]  The party challenging the sentence bears the burden of proving that it is unreasonable.  Id. at 1189.  We will reverse only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  Id. at 1191 (quoting United States v. McBride, 511 F.3d 1293, 1297-98 (11th Cir. 2007)). [7]

Here, the district court listened to Gadd's arguments for a downward variance, including his lack of a criminal history, his family situation, and his back injury. The district court also considered the fact that Gadd had undertaken rehabilitative work following his arrest, such as teaching himself a trade.

---

[6]Apart from the two guidelines calculations discussed above, Gadd does not raise any other procedural error and argues only that his sentence is substantively unreasonable.

[7]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

13

The district court then explicitly considered the § 3553(a) factors and determined that the need for deterrence and the seriousness of the offense outweighed the remaining factors. The district court recognized Gadd's possible addiction and how his actions have "had a negative effect on [Gadd's] own life" as well as "on [Gadd's] family's life." However, the district court noted that Gadd "would not be sitting here today if it was just because [he] was taking these pills." Rather, Gadd's recruitment of patients "caus[ed] other people to go right down that same path."

The district court accordingly denied Gadd's request for a more significant downward variance and imposed a 66-month sentence, at the low end of a revised guidelines range of 63 to 78 months' imprisonment. The district court stated that it imposed the sentence "based on the amount that [Gadd was] held responsible for and [his] participation in recruitment in this matter."

Gadd has not met his burden to show that his sentence was substantively unreasonable.  First, Gadd's 66-month sentence is less than half the statutory maximum for his charged offense and is within his revised guidelines range, both indicators of reasonableness.  See 21 U.S.C. § 841(b)(1)(C); United States v. McKinley, 732 F.3d 1291, 1299 (11th Cir. 2013); United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008); United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008).

14

The district court's determination that a greater downward variance was not warranted because of Gadd's managerial or supervisory role in the offense is also supported by the record. Gadd held numerous conversations with Licata, a principal conspirator, and Gadd brought new patient-recruits to Licata's clinic on multiple occasions throughout 2013 and 2014.  Gadd received kickbacks from the illegal distribution of the narcotics and provided partial payments to Licata as advance payments for his recruits.

Although Gadd argues that the district court did not adequately consider the comparative 56-month sentence awarded to a codefendant, the district court did in fact consider the issue and noted the codefendant's additional mitigating circumstance of having pled guilty earlier in the investigation.  Under these circumstances, we cannot say the district court abused its discretion in refusing to grant Gadd's request for a more significant downward variance.[8]

## IV.  CONCLUSION

For all of the above reasons, we affirm Gadd's 66-month sentence.

**AFFIRMED.**

---

[8]We need not, and do not, address Gadd's additional argument that certain evidence from his cell phone was the product of an illegal search. Gadd acknowledges in his brief that seized evidence, even if seized illegally, is generally admissible at a sentencing hearing. United States v. Lynch, 934 F.2d 1226, 1236 (11th Cir. 1991). Gadd otherwise presents no particularized challenge to the reliability of the evidence in question.